# In the United States Court of Federal Claims

No. 19-199C
(Filed: April 20, 2020)

| | |
|---|---|
| **DOYON UTILITIES, LLC,**  *Plaintiff,*  v.  **UNITED STATES,**  *Defendant.* | **Keywords:** 12(b)(1); Changes Clause; 12(b)(6); No-Interest Rule; Sovereign Immunity |

*Adam Whitfield Cook,* Birch, Horton, Bittner & Cherot, P.C., Anchorage, AK, for Plaintiff.

*Steven Charles Hough,* Trial Attorney, *Steven J. Gillingham,* Assistant Director, *Robert E. Kirschman, Jr.,* Director, and *Joseph H. Hunt,* Assistant Attorney General, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., with whom were *Brandon Cogswell,* Senior Counsel, Defense Logistics Agency Energy, Ft. Belvoir, VA, for Defendant.

## MEMORANDUM OPINION AND ORDER

**TAPP, Judge.**[1]

In this Contracts Dispute Acts (CDA) case, Plaintiff, Doyon Utilities, LLC ("Doyon"), constructed two landfill natural gas ("LFG") facilities in order to supply Defendant, the United States, with electricity at Joint Base Elmendorf-Richardson ("JBER")—a joint air force and army base in Anchorage, Alaska. (*See* Compl. ¶ 1, ECF No. 1). Under a pass-through agreement between the United States and Doyon, Doyon was to purchase LFG from the Municipality of Anchorage ("MoA"), who owned and operated a landfill generating LFG, and resell that LFG to the United States at cost. (*See* Compl. at 2–3). However, because of the United States' delay in payment, Doyon was forced to obtain a loan to sustain its operations and the United States refused to reimburse Doyon for the interest it incurred on that loan. (*Id.* at 4–7). Thus, Doyon filed this suit seeking a reimbursement of $178,096 for interest accrued between June 28, 2013 (when Doyon made its initial loan payment) and January 9, 2015 (when Doyon received payment from the United States). (*Id.* at 8–10).

Before the Court is the United States' Motion to Dismiss. (Def.'s Mot., ECF No. 14). The United States seeks dismissal on two separate grounds: (1) lack of subject matter jurisdiction

---

[1] The case was originally assigned to Senior Judge Charles F. Lettow and transferred to Judge David A. Tapp on December 3, 2019. (*See* ECF No. 22).

pursuant to RCFC 12(b)(1); and (2) failure to state a claim under RCFC 12(b)(6). (*Id.* at 1). On October 11, 2019, Doyon filed its Response. (Pl.'s Resp., ECF No. 17). On January 24, 2020, the United States filed its Reply. (Def.'s Reply, ECF No. 25). This matter is now fully briefed and ripe for decision. For the reasons set forth below, the Court **GRANTS** the United States' Motion to Dismiss.

## Background

Doyon is a regulated utility provider and owns twelve facilities located at three United States Army bases within Alaska. (Compl. at 1). On September 28, 2007, Doyon entered into a contract ("the initial contract") with the Defense Logistics Agency Energy ("DLA Energy")[2] to provide electric, natural gas, water, and wastewater utility services at Joint Base Elmendorf-Richardson ("JBER")—a joint air force and army base in Anchorage. (*Id*. at 2; Ex. A.). Under the terms of the initial contract, Doyon was obligated to operate and maintain these utility systems, replace and upgrade the infrastructure, and extend service to new connections as requested by the United States. (Pl.'s Resp., at 3). The United States sought to develop a means for capturing and converting into electricity landfill natural gas ("LFG") generated at a nearby landfill operated by the MoA. (Compl. at 2). The initial contract did not initially provide for the supply of energy; even so, Doyon took steps to fulfill that role in constructing and operating an LFG processing facility for the benefit of the United States. (*Id.*).

### A. Landfill Gas Powerplant

In 2010, the MoA awarded Doyon a competitive procurement for construction and operation of an LFG processing facility at MoA's landfill in Anchorage, Alaska. (*Id.*). After the MoA accepted its proposal, Doyon, the MoA, and the United States began working together to develop an LFG power project. (*Id.*). On March 21, 2011, Doyon submitted a proposal to the United States for the construction and operation of an LFG processing facility at the MoA landfill (the "Techno-Economic Proposal"). (*Id*. at 3). The facility would collect and process LFG for delivery to a power plant at JBER. (*Id.*).

In response to the Techno-Economic Proposal, the DLA Contracting Officer gave Doyon a Notice to Proceed with development of a 35% design of an LFG processing facility on April 12, 2011. (*Id.* at 3–4). The Techno-Economic Proposal delineated that the project would require the purchase of the LFG from the MoA, that Doyon would operate the facility and deliver the LFG to a powerplant in JBER, and that the United States, as a beneficiary of the resulting utility services, would be ultimately responsible for the funding of the project through a pass-through[3] agreement whereby Doyon would be reimbursed for the LFG it purchased. (*Id.* at 3).

On May 24, 2011, the MoA approved construction and operation of the LFG processing facility in accordance with the Techno-Economic Proposal. (*Id.* at 4). On July 18 and August 2, 2011, Doyon and DLA Energy executed two supplemental agreements authorizing Doyon to

---

[2] DLA Energy, formerly known as the Defense Energy Support Center, is a subordinate command of the Defense Logistics Agency, a combat support agency of the United States Department of Defense. (Compl. at 2).

[3] Doyon uses the terms "pass-through" and "flow-through" interchangeably to describe this agreement.

proceed with 65% of the design and purchase "long-lead items" for construction of the LFG processing facility. (*Id.* at 3–4). On September 12, 2011, Doyon entered into a separate contract with the MoA to purchase LFG for the JBER power plant. (*Id.* at 4). This was a Master Implementation Agreement ("MIA") in which the MoA agreed to sell LFG to Doyon. (*Id.*). The MIA established a pricing mechanism for the sale of LFG to Doyon according to the weighted average of the price of natural gas reflected in a Cost of Power Adjustment ("COPA") filed by an Alaska utility with the Regulatory Commission of Alaska, referred to as the "COPA System." (*Id.* at 4).

In August of 2012, Doyon commissioned the new LFG processing facility and power plant for delivering LFG for power generation. (*Id.*). In late 2012, Doyon and the United States negotiated a pass-through mechanism by which Doyon would pass the cost of LFG to the United States at an identical rate as negotiated between Doyon and the MoA. (*Id.*). The pass-through agreement referenced in the Techno-Economic Proposal states that: "Doyon Utilities . . . with the visibility and support of the government, entered into a Master Implementation Agreement to purchase landfill gas from the Municipality of Anchorage in August of 2011. . . ." (*Id.*, Ex. 1 at 2).[4] That agreement further provides that, "[Doyon Utilities] will provide to the Government an invoice for landfill gas which is based upon the same volume and base price used to compute payment for landfill gas to the Municipality." (*Id.*, Ex. 1 at 3).[5] Thus, the COPA System utilized in Doyon's MIA with the MoA would govern the price paid by the United States for the LFG. (*Id.*). On January 17, 2013, the contracting officer for DLA notified Doyon that DLA had received the funds necessary for purchase of the LFG and a contract modification was being drafted to establish contract line items (CLINs) necessary to fund the purchase.[6] (Compl. at 4). Despite those assurances, a modification was not executed for several months. (*Id.* at 5). Pursuant to its underlying contract, Doyon began paying the MoA for LFG on May 29, 2013. (*Id.*).

During the process of finalizing the modification with the United States, and because of its obligation to pay the MoA, Doyon obtained a loan through Toronto Dominion Bank in order to keep the LFG operations funded. (*Id.* at 6). The United States provided Doyon draft modification language on June 20, 2013. (*Id.* at 4–5). The proposed modification provided that, prior to passing through costs to the United States, Doyon would compare the price paid pursuant to the MIA "COPA System" with "prevailing gas prices in Southcentral Alaska," and then summarize the findings in a written report to the United States. (*Id.* at 5). Doyon did not agree to the new requirement; thus, the modification was not effectuated. (*Id.* at 6). On June 28, 2013,

---

[4] The pass-through agreement states that the MIA between Doyon and the MoA occurred in August of 2011. However, Doyon's complaint states that the MIA was effective in September of 2011. (Compl. at 4). It is unclear from the record whether this discrepancy references two agreements or if reference to one of those dates is in error. Because it is not relevant to the motion at bar, the Court declines to address it further.

[5] Per that agreement, the LFG collected from the landfill via the Gas Collection System would be received by the Gas Processing System located at the same property and process the raw landfill gas to fuel grade specifications. (Compl. Ex. 1 at 2). Once processed, the LFG would pass through a meter and analyzer, then through a pipeline to the Doyon-operated LFG Facility. (*Id.*). At that point, the LFG would be burned to produce electricity for use by JBER. (*Id.*).

[6] It is unclear from the briefing why CLINs were not established after acceptance of the Techno-Economic Proposal or in the prior supplemental agreements.

approximately thirty days after Doyon's initial payment to the MoA, Toronto Dominion Bank made the first withdrawal from Doyon's account for the above-mentioned loan. (*Id.* at 8). This withdrawal presumably included the first interest payment. In August 2013, Doyon notified DLA's contracting officer that Doyon was reliant on borrowed funds because the pass-through modification had not yet been implemented. (*Id.* at 5, Ex. 6). On September 30, 2013, the United States executed Modification P00097 to Contract No. SP0600-07-C-8262, which established a CLIN for reimbursement for LFG consumed between November 27, 2012 to September 30, 2013, but not for future LFG use. (*Id.* at 6). Despite the modification, the United States prohibited Doyon from submitting invoices for the LFG because the price assessment provision was not yet integrated. (*Id.*). At that point, Doyon had been paying the invoices from the MoA for eight months. On July 30, 2014, the United States executed Modification P00105 to Contract No. SP0600-07-C-8262, which established a CLIN to reimburse Doyon for LFG consumed between October 1, 2013 to June 30, 2014, as well as reimbursement for the estimated LFG to be consumed for the upcoming two-month period between July 1, 2014 and September 30, 2014. (*Id.* at 7). Again, the United States prohibited Doyon from invoicing the federal government for LFG use pending finalization of the "market assessment" language. (*Id.*).

On November 3, 2014, Doyon informed the DLA contracting officer that "[Doyon] has a huge amount invested in LFG purchases, 2 years worth, and has not received payment for any of the gas." (*Id.*; Compl., Ex. 7). On December 29, 2014, Doyon and the United States finally executed a supplemental agreement permitting Doyon to pass-through its monthly LFG costs to the United States. (Compl. at 7–8). The finalized modification included the same "COPA System" for pricing LFG as encompassed in the MIA, thereby passing-through the costs as originally agreed to by the parties (*Id.*). The modification also contained "market assessment" language nearly identical to the language proposed in June of 2013. (*Id.*).

### B. Financing and Equitable Adjustment Request

On December 31, 2014, Doyon submitted a $3,718,736 invoice for LFG purchased between November 27, 2012 and September 30, 2014. (*Id.* at 8). The United States paid that invoice nine days later on January 9, 2015. (*Id.*). As previously noted, in order to finance its purchase of LFG, Doyon obtained a loan through Toronto Dominion Bank. This loan carried an interest rate of 5.03%. (*Id.* at 6, 8). Thus, Doyon accrued $178,096.00 in interest (the "Interest Balance") on the loan used to finance the purchase of LFG from the MoA. (*See id.* at 8).

On April 23, 2015, Doyon submitted to the contracting officer a $178,096.00 request for equitable adjustment for the Interest Balance incurred between June 28, 2013 and January 9, 2015. (*Id.*). The contracting officer denied Doyon's request for equitable adjustment on April 6, 2017. (*Id.*). On October 9, 2017, Doyon submitted a Certified Claim for $178,096.00, pursuant to the Contract Disputes Act, 41 U.S.C. § 7107 *et seq.*, which the contracting officer denied on February 7, 2018. (*Id.* at 9, Ex. B). This suit was brought approximately one year later.

## Standard of Review

The burden of establishing subject matter jurisdiction rests with the plaintiff, who must do so by a preponderance of the evidence. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992); *Reynolds v. Army & Air Force Exch. Serv.*, 846 F.2d 746, 748 (Fed. Cir. 1988). This

Court's jurisdiction to entertain claims and grant relief depends on the extent to which the United States has waived sovereign immunity. *United States v. Testan*, 424 U.S. 392, 399 (1976). Such a waiver is found in the Tucker Act, which grants the Court of Federal Claims jurisdiction to hear claims, *inter alia*, based on an express or implied contract with the United States. 28 U.S.C. § 1491(a)(1). However, for jurisdiction to exist, "there must be privity of contract between the plaintiff and the United States." *Cienega Gardens v. United States*, 194 F.3d 1231, 1239 (Fed. Cir. 1998).

When faced with a motion to dismiss for lack of subject matter jurisdiction pursuant to the RCFC Rule 12(b)(1), a court must assume that all undisputed facts alleged in the complaint are true and draw all reasonable inferences in the plaintiff's favor. *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974); *see also Henke v. United States*, 60 F.3d 795, 797 (Fed. Cir. 1995). The movant, however, may challenge the truth of any facts upon which jurisdiction depends. *See Raymark Indus. v. United States*, 15 Cl. Ct. 334, 338 (Cl. Ct. 1988). If it does, the plaintiff must come forward with prima facie showing of jurisdiction. *Id.* The plaintiff cannot rely only on its allegations. *See Hornback v. United States*, 52 Fed. Cl. 374, 377 (Fed. Cl. 2002). Moreover, the Court may look to evidence outside of the pleadings in order to ascertain the propriety of its exercise of jurisdiction over a case. *Rocovich v. United States*, 933 F.2d 991, 994 (Fed. Cir. 1991), *aff'd in relevant part*, *Martinez v. United States*, 281 F.3d 1376 (Fed. Cir. 2002). If the Court determines at any time that subject matter jurisdiction is lacking, it must dismiss the complaint. *See* RCFC 12(h)(3).

Under RCFC Rule 8, a pleading must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Pursuant to RCFC Rule 12(b)(6), the Court will grant a defendant's motion to dismiss if it finds the plaintiff has failed to state a claim upon which relief may be granted. In considering a motion to dismiss for failure to state a claim, the Court "must accept as true all of the allegations in the complaint" and "must indulge all reasonable inferences in favor of the non-movant." *Sommers Oil Co. v. United States*, 241 F.3d 1375, 1378 (Fed. Cir. 2001).

In order for a claim to be properly stated, the complaint "must contain sufficient factual matter, accepted as true, to state a claim for relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "[O]nly a complaint that states a plausible claim for relief survives a motion to dismiss." *Id.* "A claim is plausible on its face when 'the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Id*. This plausibility standard requires that a complaint contain "more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.* (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)). Neither allegations "that are 'merely consistent with' a defendant's liability," nor "threadbare recitals of the elements of a cause of action, supported by mere conclusory statements," are sufficient. *Id.* A complaint should be dismissed under RCFC 12(b)(6) "when the facts asserted by the claimant do not entitle him to a legal remedy." *Lindsay v. United States*, 295 F.3d 1252, 1257 (Fed. Cir. 2002).

## Discussion

In its Complaint, Doyon advances three arguments in support of its claim for relief: (1) under the Contract Changes clause, FAR 52.243-1, Alt I, "the Contracting Officer's approval of

[Doyon's] proposal to construct an LFG processing facility was a 'change to the general scope of the contract,'" that resulted in an increase in the cost of performance to Doyon; (2) alternatively, under the Contract Changes clause, FAR 52.243-1, Alt I, "the Contracting Officer's approval in the fourth quarter of 2012 of a 'pass-through' of the LFG, using the same pricing mechanism as the one agreed to by [Doyon] and the MoA, was a 'change in the general scope of the contract," that resulted in an increase in the cost of performance to Doyon; and (3) alternatively, the Contracting Officer constructively changed the Contract requirements. (Compl. at 9).

In its motion to dismiss, the United States argues that Doyon has failed to state a claim for which relief can be granted because "interest on borrowings in an unallowable cost under the Federal Acquisition Regulation (FAR) and the Defense Federal Acquisition Regulation Supplement (DFARS)." (Def.'s Mot. at 4–6). The United States also argues that subject matter jurisdiction is lacking because Doyon's claim for interest on borrowings is barred by sovereign immunity. (*Id.* at 6–13). The United States further maintains that Doyon has failed to state a claim based on an actual change because "the contract's changes clause applies only to unilateral change orders, not supplemental agreements." (*Id.* at 13–15). With regard to Doyon's constructive change theory, the United States argues that: (1) the Court lacks subject matter jurisdiction over this claim because Doyon failed to submit this claim to the Contracting Officer as required by the CDA; and (2) Doyon failed to state a claim upon which relief can be granted because Doyon was not required to perform work beyond the contract requirements but rather made use of the debt financing unilaterally. (*Id.* at 15–17).

In response, Doyon argues: (1) it has stated a cognizable claim under the changes theory because "the services ordered by [the United States] were intended to flow through a utility tariff and are therefore allowable according to both the express terms of the agreement and the trade practices of the industry"; (2) subject matter jurisdiction exists for Doyon's changes theory because it filed a Certified Claim "following the contracting officer's unilateral modification to the scope of the agreement"; (3) Doyon's claim is not barred by sovereign immunity because "where, as here, such costs are both demonstrably connected to additional work ordered by [the United States] and incurred pursuant to the Changes clause of the contract, sovereign immunity is waived"; (4) Doyon has stated a claim under its constructive change theory as it has "met the minimum requirement of facts necessary to assert a claim with both a recitation of facts and attachment of exhibits to the Complaint"; (5) Doyon presented "the basic allegation of constructive claim . . . or, at the very least, the minimum necessary operative facts forming the basis for the allegation were present in the claim" that Doyon submitted to the Contracting Officer. (Pl.'s Resp. at 1–2). In addition, Doyon objects to Exhibit A of the United States' motion as an improper exhibit. (*See* Pl.'s Resp. at 9–10).

As explained below, the Court concludes that Doyon has sufficiently stated a cause of action so as to avoid dismissal for failure to state a claim but agrees with the United States that Doyon's claim for reimbursement of interest is barred by sovereign immunity. Consequently, the United States' other theories of dismissal are moot.

    A.  *Consideration of United States' Exhibit*

At the outset, Doyon objects to the Court's consideration of Exhibit A to the United States' motion *sub judice*, which it refers to as the "28 September 2007 Contract referenced at

Paragraph 6 of Doyon's Complaint." (Pl.'s Resp. at 9-10). Doyon submits that "Exhibit A is not the Contract. It appears to be a draft agreement that was never executed by the parties, and is in a redline or 'track changes' format." (*Id.*). Doyon's response attaches the original, unmodified contract of September 28, 2007. (*See* Pl.'s Resp. Ex. 1). The United States indicates that the objected exhibit was a "conformed version of the contract submitted for the convenience of the Court and the parties, and reflects the relevant supplemental agreements (i.e., bilateral contract modifications) that are now part of the contract . . . ." (Def.'s Reply at 2). Though Doyon objects to the consideration of such document, it does not challenge the authenticity of what the document purports to be. After comparing that document to the official contract, this Court finds that the Complaint substantially relied on the changes made and relevant supplemental agreements. Therefore, the document will not be excluded from consideration.

  B. "No-Interest" Rule

Doyon principally seeks to recover the interest it incurred on the loan it received from Toronto Dominion Bank. The United States contends that Doyon's claim for interest fails to state a claim because, according to the United States, "interest on borrowings is an unallowable cost under the Federal Acquisition Regulation (FAR) and the Defense Federal Acquisition Regulation Supplement (DFARS)." (Def.'s Mot. at 4–6). The Court disagrees.

Doyon's complaint is predicated on the recoverability of interest pursuant to the changes clause incorporated into the contract, which provides:

> (a) The Contracting Officer may at any time, by written order, and without notice to the sureties, if any, make changes within the general scope of this contract in any one or more of the following:
>
>   (1) Description of services to be performed.
>
>   (2) Time of performance (i.e., hours of the day, days of the week, etc.).
>
>   (3) Place of performance of the services.
>
> (b) If any such change causes an increase or decrease in the cost of, or the time required for, performance of any part of the work under this contract, whether or not changed by the order, the Contracting Officer shall make an equitable adjustment in the contract price, the delivery schedule, or both, and shall modify the contract.
>
> (c) The Contractor must assert its right to an adjustment under this clause within 30 days from the date of receipt of the written order. However, if the Contracting Officer decides that the facts justify it, the Contracting Officer may receive and act upon a proposal submitted before final payment of the contract.

(Def.'s Mot. at 13 (citing FAR § 52.243-1)).

7

The interest and other financial costs section of the FAR provides that, in contracts with commercial organizations, "[i]nterest on borrowings (however represented), bond discounts, [and] costs of financing and refinancing capital . . . are unallowable" costs. FAR § 31.205-20, 48 C.F.R. § 31.205-20. "By its terms," this provision "applies to interest on borrowings. A borrowing is generally defined as a loan." *Lockheed Corp. v. Widnall*, 113 F.3d 1225, 1227 (Fed. Cir. 1997) (internal quotation marks omitted).[7] The FAR's contract cost principles and procedures provide that this "no-interest" provision applies to "[t]he pricing of contracts, subcontracts, and modifications to contracts and subcontracts whenever cost analysis is performed" and to "[t]he determination, negotiation, or allowance of costs when required by a contract clause." FAR § 31.000. The DFARS' pricing of contract modifications clause provides that "[w]hen costs are a factor in any price adjustment under this contract, the contract cost principles and procedures in FAR part 31 . . . apply." DFARS § 252.243-7001; 48 C.F.R. § 252.243-7001.

Under 28 U.S.C. § 2516(a), "[i]nterest on a claim against the United States shall be allowed in a judgment of the United States Court of Federal Claims only under a contract or Act of Congress expressly providing for payment thereof." 28 U.S.C. § 2516(a). Much ink has been spilled on the long-standing "no-interest rule" as it applies to government contracts. Through the years, countless contractors have argued for reimbursement of extraneous costs incurred as a result from a government change to the contract or some other action must that be financed either through borrowings, through use of equity capital, or a combination of the two.

In early decisions, courts ruled that interest paid to third parties to finance changed work was a proper component of equitable adjustments. *See Bell v. United States*, 404 F.2d 975 (Ct. Cl. 1968); *see also England v. Contel Advanced Sys., Inc.*, 384 F.3d 1372, 1379 (Fed. Cir. 2004) (discussing *Bell*); *J.D. Hedin Constr. Co. v. United States*, 456 F.2d 1315, 1330 (Ct. Cl.1972) (same). In *Bell*, following several "Change Orders" from the government unilaterally modifying the contractor's obligation, the contractor sought to recover interest costs undertaken in order to meet the changed requirements. *Bell,* 404 F.2d at 975. This court's predecessor held that those costs were recoverable, reasoning that the subject clause contemplated the award of interest costs to compensate a contractor for changes to the contract, thereby constituting government consent to the award of interest. *Id.* at 984. Further, the court held that DOD's policy of allowing interest as a cost under an equitable adjustment was not in conflict with 28 U.S.C. § 2516(a) because "the statute and its policy apply to demands in 'breach' claims against the United States where the plaintiff seeks compensation for delay in payment." *Id.* at 983–84. The court determined that the plaintiff's demand was "not based upon 'breach' but upon a change compensable under the 'Changes' article which recover entitles the contractor to reimbursement for the resulting 'increase … in the cost of performance of this contract.'" *Id.* at 984.

Since *Bell*, the Federal Circuit has allowed for recovery of financing-related costs "as part of an equitable adjustment under a fixed-price contract if the contractor has actually paid interest because of the government's delay in payment," but cautioned that "interest on equity capital is

---

[7] *Widnall*, *supra*, and *Servidone Construction*, *infra*, considered section 15-205.17 of the former Defense Acquisition Regulation (DAR), which "was superseded" by the FAR in 1984. *Widnall*, 113 F.3d at 1226 n.3. However, "[t]he corresponding . . . provision[]," DAR § 15-207.15, is identical to FAR § 31.205-20, "in all relevant aspects." *Ingalls Shipbuilding, Inc. v. Dalton*, 119 F.3d 972, 975 (Fed. Cir. 1997).

8

not recoverable." *Wickham Contracting Co. v. Fischer*, 12 F.3d 1574, 1582–83 (Fed. Cir. 1994). In *Wickham Contracting*, the construction company contracted with the General Services Administration (GSA) for restoration of a post office and courthouse. 12 F.3d 1574. Due to GSA-imposed delays, the work was not completed within the timeframe dictated by the contract. *Id.* at 1575. Based on these delays, the contractor sought reimbursement for additional overhead costs and the cost of both equity capital and borrowed funds during the delay. *Id.* at 1577. While the court rejected the contractor's claim for interest on equity capital, it noted that "[a]lthough interest on equity capital is not recoverable, a contractor may recover interest actually paid on funds borrowed because of the government's delay in payments and used on the delayed contract." *Id.* at 1582 (citing *Gevyn Constr. Co. v. United States*, 827 F.2d 752, 754 (Fed. Cir. 1987)). In *Gevyn*, the court held, "[28 U.S.C. §] 2516(a) does not bar an interest award as part of an equitable adjustment under a fixed-price contract if the contractor has actually paid interest because of the government's delay in payment." *Gevyn*, 827 F.2d at 754. Nevertheless, *Wickham Contracting* affirmed the denial of the plaintiff's claim because it "did not show that the amount sought based on the borrowed funds was incurred in connection with [the project]. . . ." *Wickham Contracting*, 12 F.3d at 1583.

In 2004, the Federal Circuit directly addressed the "no-interest rule" in the context of a contract case where the recovery of "interest [that a contractor] paid on the extra money it was forced to borrow as a result of the [United States'] delay" was ultimately denied. *See Contel Advanced*, 384 F.3d at 1379. In *England v. Contel Advanced,* the plaintiff (CASI) sought to recover interest on money borrowed to finance its performance of a contract to maintain a telecommunication system for the Navy. *Id.* at 1374. The implementation phase of the contract was awarded to CASI on a lease to ownership basis and incorporated an interest component to compensate for payment over a 60-month span. *Id.* at 1375. At the time of acceptance, the number of units installed was significantly less than what was originally contemplated, but the Navy did not adjust the contract price until many years later. *Id.* To compensate for that delay, CASI obtained a loan from its parent company against which it assigned the Navy's installment payments. *Id.* Because of the United States' delay in readjusting the contract price, CASI incurred a financing charge greater than would have otherwise. *Id.* at 1376. The court held that the "no-interest" rule applied to costs incurred to borrow money where there is a "delay in payment," reasoning that "[t]he [no-interest] rule . . . [bars] interest costs incurred on money borrowed as a result of the [G]overnment's breach." *Id.* at 1379. The Court, quoting *J. D. Hedin Construction*, 456 F.2d at 1330, stated that "[i]nterest paid on bank loans made because of financial stringency resulting from a breach by the United States of a contract between it and the borrower is not recoverable." 384 F.3d at 1379 (internal citations omitted). Ultimately, the *Contel Advanced* Court concluded that *because there was no waiver*, the no-interest rule barred CASI from recovering the excess interest costs that occurred as a result of the government's delay. 384 F.3d at 1380.

The United States argues that *Bell* is no longer binding precedent because it is based on Department of Defense Instruction No. 4105.11 dated November 23, 1954 (DODI 4105.11), which has since been superseded. (Def.'s Mot. at 11 (citing *Easter v. United States*, 575 F.3d 1332, 1337 (Fed. Cir. 2009); *cf. Wichita Eng'g*, 1955 WL 8899)). The Court, however, is not persuaded. In *Energy Northwest,* the United States partially breached its standard contract to dispose of spent nuclear fuel. *Energy Northwest v. United States*, 641 F.3d 1300 (Fed. Cir. 2011). In order to mitigate its damages, Energy Northwest borrowed funds to finance the

construction of a storage unit where the spent nuclear fuel could be stored indefinitely. *Id.* at 1304. In doing so, it incurred approximately $6 million in interest expenses. *Id.* at 1303. Energy Northwest's claim was largely grounded on the holding in *Wickham Contracting*. *Id.* at 1311. In defense, the United States argued that sovereign immunity shielded the government against liability for the entirety of interest claimed by the plaintiff, relying on *Library of Congress v. Shaw*, 478 U.S. 310 (1986). *Id.* The Federal Circuit agreed, holding that there was no waiver of sovereign immunity without a changes clause. *Id* at 1312. Of particular note here, the Federal Circuit explained:

> Energy Northwest is reading too much into *Wickham Contracting*. . . [T]hat case's pronouncement that "a contractor may recover interest actually paid on funds borrowed" was limited to the context of an "equitable adjustment." The term "equitable adjustment" had specific meaning in government contracting cases denoting the presence of a "Changes" clause. Although *Wickham Contracting* does not expressly describe such a clause, the core issue in that case was the application of an "equitable adjustment" for numerous delays unilaterally imposed by the General Services Administration ("GSA"). The opinion repeatedly refers to "the Eichleay formula"—a formula used in computing equitable adjustments under a "Changes" clause. And the Board opinion underlying *Wickham Contracting* notes the GSA's many "change orders."
>
> Based on this we conclude that *Wickham Contracting*, contrary to Energy Northwest's contention, was in fact a "Changes" clause case governed by *Bell*. Because the "Changes" clause amounted to a waiver of the government's immunity against recovery of interest, *Wickham Contracting* cannot stand for the proposition Energy Northwest puts forward (i.e., that interest may be recovered without a waiver if the interest is traceable to the breach).

*Id.* (internal citations omitted).

*Energy Northwest* distinguished *Bell* and its progeny by explaining that the plaintiffs in those cases sought an equitable adjustment, and "the underlying reason for the interest award was the United States' consent to liability for interest, indicated by the inclusion of the 'Changes' clause." *Id.* at 1311. Accordingly, interest is recoverable for an equitable adjustment if the changes clause applies and the contract does not expressly provide otherwise.

Here, Doyon seeks an equitable adjustment to recover interest it incurred based on the government's delayed payment. This request is predicated on the existence of the changes clause, because the Contracting Officer's approval of Doyon's proposal to construct an LFG processing facility was a "change to the general scope of the contract," resulting in an "increase . . . in the cost of performance." (Compl. at 9). *Energy Northwest* makes clear that *Bell* remains binding precedent; there are situations where interest *is* recoverable against the United States. Whether interest is recoverable against the United States in this case is entirely dependent on whether the changes clause waives the Government's sovereign immunity. Thus, the no-interest rule does not, by itself, preclude Doyon's claims.

*C. Sovereign Immunity*

The United States, in the alternative, argues that Doyon's claims are barred by sovereign immunity. In support of that argument, it states that *Bell* would not permit Doyon to recover in this case because the relevant clause expressly excludes the recovery of interest, a distinction in the *Bell* contract. Because of that exclusion, the United States claims that the existence of a changes clause does not explicitly waive sovereign immunity.

In regard to sovereign immunity, Doyon argues that the costs it incurred are demonstrably connected to additional work ordered by Defendant and incurred pursuant to the changes clause of the contract, such that sovereign immunity is waived. (Pl.'s Resp. at 2). Doyon further argues that 28 U.S.C. § 2516(a) bars the recovery of compounding interest on a claim but does not bar interest actually paid on funds borrowed because of the government's delay. (*Id.* at 17–18). Finally, Doyon maintains that, contrary to the argument of the United States, FAR's disallowance of interest claims on the United States does not apply to a contract for utilities where tariffs were approved by regulatory agencies and are exempt pursuant to 48 C.F.R. § 9903.201-1(b)(5). (Pl.'s Resp. at 12). This argument goes to whether the incorporation of the FAR § 31.205-20 and DFARS § 252.243-7001 apply to this contract.

Accordingly, it must be determined whether sovereign immunity has been effectively waived by the changes clause. Doyon does not allege that it is entitled to recover interest pursuant to a statutory waiver of sovereign immunity but apparently suggests that the mere existence of the relevant clause acts as a waiver. As previously noted, 28 U.S.C. § 2516(a) provides that, "[i]nterest on a claim against the United States shall be allowed in a judgment of the United States Court of Federal Claims only under a contract or Act of Congress expressly providing for payment thereof." That statute codifies the rule that sovereign immunity bars claims for interest against the United States in the absence of a contract provision or statute providing for payment of interest. 28 U.S.C. § 2516(a), *see also Getty Oil Co. v. United States*, 767 F.2d 886 (Fed. Cir. 1985). Consistent with other waivers of sovereign immunity, waivers of immunity for the payment of interest has been construed narrowly. *See Shaw*, 478 U.S. at 321 ("[The] character or nature of 'interest' cannot be changed by calling it 'damages,' 'loss,' 'earned increment,' 'just compensation,' 'discount,' 'offset,' or 'penalty,' or any other term, because it is still interest and the no-interest rule applies to it.") (alteration in original)); *see also Sandstrom v. Principi*, 358 F.3d at 1380 (Fed. Cir. 2004) ("Under the long-standing 'no-interest rule,' sovereign immunity shields the U.S. government from interest charges for which it would otherwise be liable, unless it explicitly waives that immunity[.]").

Apart from the specific statutory authorizations, case law finding the United States liable for interest involves contracts that encompassed a waiver of the United States' immunity. The seminal case, *Bell v. United States*, found a contractual waiver of the no-interest rule by virtue of the contract changes clause, which called for an equitable adjustment to the contract price. 404 F.2d 975. *Bell* specifically dealt with an Army procurement contract that included a changes clause authorizing judicial adjustment of the contract terms to account for unilateral changes the government might make to the contractor's obligation. *Id.* at 976. After the government unilaterally issued change orders modifying the contractor's obligations, the contractor sought to recover certain interest costs undertaken in order to meet the changed requirements. *Id.* That changes clause in *Bell* provided:

> The Contracting Officer may at any time, by a written order, and without notice to the sureties make changes of any one or more of the following types:
>
> . . .
>
> If such changes cause an increase or decrease in the amount of work under this contract or in the cost of performance of this contract or in the time required for its performance an equitable adjustment shall be made. . . .

*Id.* at 976–77. This Court's predecessor held that such costs were recoverable, reasoning that the subject clause necessarily contemplated the award of interest costs to compensate a contractor for changes to the contract; this constituted government consent to the award of interest. *Id.* at 984.

In *Wickham Contracting*, the plaintiff sought recovery of interest payments incurred in order to finance performance under a government contract. *Wickham Contracting*, 12 F.3d at 1574. There is no explicit reference to a changes clause in *Wickham Contracting* opinion. The court ultimately denied plaintiff's claim for lack of proof, but noted that, although interest on equity capital is not recoverable, a contractor may recover interest actually paid on funds borrowed because of the government's delay in payments and used on the delayed contract. *Id.* at 1582–83 (citing *Gevyn Constr. Corp. v. United States,* 827 F.2d 752, 754 (Fed. Cir. 1987) ("[28 U.S.C. §] 2516(a) does not bar an interest award as part of an equitable adjustment under a fixed-price contract if the contractor has actually paid interest because of the government's delay in payment.")).

On this point, case law is scarce as to what the changes clause must incorporate in order to effectively waive the shield of sovereign immunity. In *Servidone Construction Corp. v. United States,* the Claims Court found the Government liable for contractor's increased costs due to differing site conditions but rejected contractor's request for recovery of interest on borrowings it made to cover additional performance costs. 19 Cl. Ct. 346 (1990). Specifically, with regard to the recovery of interest, the court found:

> General Provision 19 of the contract controls the pricing of change orders. In turn, it incorporates section 15 of the Defense Acquisition Regulations ("DAR"). The applicable DAR is found at 32 C.F.R. § 15–205.17 (1982). That section provides that "[i]nterest on borrowed funds (however represented) [is] unallowable." The applicability of such a provision in the present case conclusively precludes recovery of interest.

*Id.* at 386. On appeal, the Federal Circuit held that: (1) the award of damages under modified total cost method was not clear error, and (2) the contractor was not entitled to recover as damages interest it paid on sums borrowed to cover excess costs. *Servidone Const. Corp. v. United States,* 931 F.2d 860 (Fed. Cir. 1991). In its affirmation of the trial Court decision, the Court of Appeals found that Servidone's contract specifically barred recovery of this interest. *Id.* at 863 (citing language quoted above).

Here, the subject changes clause states, in relevant part:

(a) The Contracting Officer may at any time, by written order, and without notice to the sureties, if any, make changes within the general scope of this contract . . .

(b) If any such change causes an increase or decrease in the cost of, or the time required for, performance of any part of the work under this contract, whether or not changed by the order, the Contracting Officer shall make an equitable adjustment in the contract price, the delivery schedule, or both, and shall modify the contract . . . .

(Def.'s Mot. at 13–14 (citing FAR § 52.243-1)). Though its language is identical to that in *Bell,* Doyon's contract with the United States specifically incorporates the DFARS' pricing of contract modifications clause. Importantly, that clause states, "when costs are a factor in any price adjustment under this contract, *the contract cost principles and procedures in FAR part 31 . . . apply*." (*See* Def.'s Mot., Ex. A at 54) (emphasis added). Based on the that provision, FAR part 31's interest and other financial costs provision applies to the pricing of modifications and adjustments under its contract and the changes clause. (*Id.*). The incorporation of the provision effectively barring interest means that the changes clause does not apply and sovereign immunity is not waived. Thus, as argued by the United States, Doyon's claims are governed by *Servidone* rather than by *Bell* and its progeny. Because Doyon's contract with the United States contains a specific provision excepting interest from the changes clause, Doyon is precluded from recovering interest on borrowings through an equitable adjustment. *See* FAR § 31.205-20 ("[I]nterest on borrowings . . . are unallowable" costs.); DFARS § 252.243-7001. The Court finds that the changes clause does not amount to a waiver of sovereign immunity, as the recovery of interest is explicitly barred by incorporation of DFARS § 252.243-7001.

Doyon asserts that the United States' sovereign immunity against liability for recovery of interest on borrowing, as it is codified in 28 U.S.C. § 2516(a), bars interest *on* a claim and not *as* a claim. (Pl.'s Resp. at 17). The Court is not swayed by this argument. The Court in *Energy Northwest* rejected an argument identical to Doyon's. 641 F.3d. 1300. As to whether sovereign immunity applies to interest "as" a claim, the Federal Circuit explained that the court may only award interest as an equitable adjustment pursuant to changes requested by the government under a changes clause when the changes clause "amount[s] to a waiver of the government's immunity against recovery of interest." 641 F.3d at 1310–1311. Here, because there has been no waiver of immunity, recovery of the Interest Balance as a claim is not allowable.

As to whether the non-interest recovery provision of the FAR applies to this contract, Doyon maintains that interest on borrowings is an allowable cost because the Cost Accounting Standards (CAS) under FAR part 30 and chapter 99 of the FAR Appendix do not apply to its contract. (Pl.'s Resp. at 12). According to Doyon:

Doyon incurred financing costs purchasing LFG for the purpose of generating electricity, with plans to include all utility costs in tariff rates. Doyon incurred financing costs in anticipation that they would be exempt from [the Cost Accounting Standards ("CAS")] and therefore allowable. The Government

13

> cannot avail itself of the DFARS provision to "reverse" Doyon's reasonable expectations.

(Pl.'s Resp. at 20). FAR part 31 sets forth the Cost Principles that govern whether a cost is *allowable*—*i.e.*, "whether a particular cost can be recovered from the government." *Boeing N. Am., Inc. v. Roche*, 298 F.3d 1274, 1280 (Fed. Cir. 2002). In contrast, the CAS in FAR part 30 and the FAR Appendix govern whether a cost is *allocable*, which is "an accounting concept involving the relationship between incurred costs and the activities or cost objectives (*e.g.*, contracts) to which those costs are charged." *Id.* Thus, by stating that "FAR Part 31 is 'Cost Accounting Standards' ('CAS')," Doyon melds concepts of cost allowability under the Cost Principles of FAR part 31 and cost allocability under FAR part 30 and the FAR Appendix. (*See* Pl.'s Resp. at 12). "Although a cost may be allocable to a contract, the cost is not necessarily allowable." *Roche*, 298 F.3d at 1280. As such, Doyon's argument in this regard is meritless.

In further support of its position, Doyon contends that "the Preamble of the Contract states: 'Doyon is exempt from Cost Accounting Standards' and 'FAR Part 31 does not apply to this contract.'" (Pl.'s Resp. at 12–13). However, the language cited by Doyon was expressly "deleted in its entirety" by Modification No. P00003. (*See* Def.'s Mot., Ex. C at 13). The modification language unambiguously states:

> Item number two of the Preamble is hereby deleted in its entirety and replaced with the following: 2. As a result of the above and subject to the conditions set forth in the CAS Waiver, September 2, 2004, and FAR Part 31 Deviation, August 13, 2007, granted with respect to utilities privatization, the Contracting Officer has determined that the Tariff Rate component of the Fixed Monthly Charge identified in Section B.4 of this Contract is exempt from Cost Accounting Standards (CAS) in accordance with 48 CFR 9903.201-1(b)(5) and the requirements of FAR Part 31. Should RCA withhold its approval of Doyon's application for regulated status and the contract type is modified to FPPPR, the Contracting Officer will modify this determination accordingly.

(*Id.*). In its place, the updated contract provides merely that "*the Tariff Rate component of the Fixed Monthly Charge . . . is exempt from Cost Accounting Standards (CAS).*" (Def.'s Mot., Ex. C at 13; Ex. A at 6). Modification No. P00003 explicitly states that the "[l]anguage in the contract preamble is [being] modified to clarify the limitations of the CAS exemption and applicability of FAR Part 31" to the contract. (Def.'s Mot., Ex. C at 2). Thus, even if the Court was compelled by Doyon's reasonable expectation argument, the face of the contract makes clear that the Cost Principles in FAR part 31, including the provision making interest on borrowings costs unallowable, apply to all but the Tariff Rate component of the contract.

Under the reasoning in *Servidone*, FAR part 31's cost principles and procedures render Doyon's costs of "interest on borrowings" unallowable, impeding its claim for interest. *See Servidone*, 19 Cl. Ct. at 383. Though the Court sympathizes with Doyon's plight, case law makes it clear that the aim of the "no-interest rule" is to "permit the Government to occupy an apparently favored position by protecting it from claims for interest that would prevail against private parties." *See Shaw*, 478 U.S. at 315–16 (internal citations and quotations omitted).

14

Therefore, the Court concludes that subject matter jurisdiction is lacking because the United States is shielded by sovereign immunity. Consequently, the United States' other arguments in favor of dismissal are moot and will not be addressed.

## Conclusion

The Court finds that the United States is shielded by sovereign immunity. Therefore, the Court **GRANTS** the United States' Motion to Dismiss pursuant to RCFC 12(b)(1).

The Clerk is directed to enter judgment accordingly.

**IT IS SO ORDERED.**

s/    David A. Tapp  
DAVID A. TAPP, Judge